# Illinois Official Reports

## Appellate Court

---

### *Enbridge Pipeline (Illinois), L.L.C. v. Murfin*, 2020 IL App (5th) 160007

---

| | |
|---|---|
| Appellate Court Caption | ENBRIDGE PIPELINE (ILLINOIS), L.L.C., n/k/a Illinois Extension Pipeline Company, L.L.C., Plaintiff-Appellee, v. MARK MURFIN JR., BRENDA MURFIN, PEOPLES NATIONAL BANK, as Mortgagee, and NONRECORD CLAIMANTS and UNKNOWN OWNERS, Defendants-Appellants. |
| District & No. | Fifth District<br>No. 5-16-0007 |
| Filed | January 28, 2020 |
| Decision Under Review | Appeal from the Circuit Court of Marion County, No. 14-ED-1; the Hon. Stanley M. Brandmeyer, Judge, presiding. |
| Judgment | Vacated; cause remanded with directions. |
| Counsel on Appeal | Thomas J. Pliura, of LeRoy, for appellants.<br><br>John M. Spesia and Jacob E. Gancarczyk, of Spesia & Ayers, of Joliet, for appellee. |

Panel                    JUSTICE BARBERIS delivered the judgment of the court, with opinion.
                         Justices Cates and Boie* concurred in the judgment and opinion.


## OPINION

¶ 1      Plaintiff, Enbridge Pipelines (Illinois), L.L.C., now known as Illinois Extension Pipelines Company, L.L.C. (IEPC), filed a condemnation action in the circuit court of Marion County seeking to acquire permanent and temporary easement interests in property owned by defendants (landowners), Mark Murfin Jr. and Brenda Murfin, in accordance with the Eminent Domain Act (Act) (735 ILCS 30/1-1-1 *et seq.* (West 2014)) for the construction, operation, and maintenance of a liquid petroleum pipeline. Landowners filed a traverse and motion to dismiss (traverse motion) requesting dismissal of IEPC's condemnation action, which the court later denied pursuant to section 2-619 of the Code of Civil Procedure (Code) (735 ILCS 5/2-619 (West 2014)).

¶ 2      Before the case proceeded to a jury trial on the issue of just compensation, landowners filed a counterclaim seeking compensation for damage to the remainder of their property not taken, and IEPC filed numerous motions *in limine* seeking to preclude landowners from presenting certain evidence or testimony to establish diminution in value or remainder damages at trial. The circuit court subsequently granted IEPC's motions to exclude evidence or testimony concerning certain factors, including pipeline dangers and the terms of the easement. The court also restricted testimony and limited cross-examination concerning those factors at trial. After trial, the jury found that the just compensation due to landowners totaled $59,000, and the court entered a final judgment to that effect.

¶ 3      Landowners appeal, raising a number of issues that challenge the circuit court's rulings on their traverse motion and certain evidentiary matters. For the following reasons, we vacate the court's denial of landowners' traverse motion and remand with directions for further proceedings.


¶ 4                                    I. Background
¶ 5                                 A. Expansion Project
¶ 6      IEPC is a Delaware limited liability company with its principal office in Houston, Texas. IEPC is the wholly owned subsidiary of an energy transportation and distribution corporation, Enbridge, Inc. (Enbridge), and, thus, is affiliated with Enbridge Energy Partners, L.P. (Enbridge Partners), and Enbridge Energy, Limited Partnership (Enbridge Energy). Enbridge is headquartered in Canada and has a liquid transportation unit that conveys, through an integrated pipeline network, oil from producers and shippers in western Canada to markets and refineries in the United States and Eastern Canada. The pipeline network, which spans approximately 1900 miles across North America, is comprised of numerous segments,

---

*Justice Goldenhersh was originally assigned to participate in this case. Justice Boie was substituted on the panel subsequent to Justice Goldenhersh's retirement and has read the briefs and listened to the recording of oral argument.

including the international "Mainline System," the "Southern Access Expansion System," the "Southern Lights System," the "Ozark System," and the "Spearhead System." Enbridge Partners and Enbridge Energy own and operate the United States portion of the Mainline System, known as the Lakehead System, which spans across seven states, including Illinois.

¶ 7 In December 2005, Enbridge Partners and Enbridge Energy initiated the "Southern Access Expansion Project" (SAX project) to provide "adequate, efficient, and economic transportation service for producers and users of crude petroleum." The initial phase of the SAX project involved the construction of a new pipeline in Wisconsin that would run parallel to the Lakehead System. The next phase of the project involved the construction of a new pipeline that would run from the termination point of the initial phase of the project to Enbridge's Flanagan terminal located near Pontiac, Illinois. The SAX project, if completed, would allow Enbridge to transport an additional 400,000 barrels per day (bpd) to its Flanagan terminal.

¶ 8 B. Illinois Commerce Commission Proceedings

¶ 9 In April 2007, Enbridge Partners and Enbridge Energy were certified by the Illinois Commerce Commission (ICC) as common carriers by pipeline pursuant to section 15-401 of the Common Carrier by Pipeline Law (Pipeline Law) (220 ILCS 5/15-401 (West 2006)) of the Public Utilities Act (Utilities Act) (220 ILCS 5/1-101 *et seq.* (West 2006)). The ICC also authorized Enbridge Partners and Enbridge Energy to construct, operate, and maintain the second segment of the SAX project along an approved route pursuant to section 8-503 of the Utilities Act (*id.* § 8-503). Specifically, the ICC authorized the two entities to construct, operate, and maintain a new pipeline from the Wisconsin border to Enbridge's Flanagan terminal.

¶ 10 In August 2007, IEPC filed an application with the ICC (Docket No. 07-0446) seeking certification and authorization for the construction, operation, and maintenance of an extension of the SAX project (Extension Project) along a proposed route. The proposed route of the Extension Project originated at Enbridge's Flanagan terminal and terminated near Patoka, Illinois, traversing over 679 tracts of land located in the counties of Livingston, McLean, De Witt, Macon, Shelby, Christian, Fayette, and Marion. The application indicated that 60-foot-wide permanent and temporary easement rights along the proposed route were necessary to facilitate the construction, operation, and maintenance of the SAX pipeline. IEPC's application requested the following: (1) issuance of a "Certificate in Good Standing" pursuant to section 15-401 of the Pipeline Law (*id.* § 15-401), which can be found in the Utilities Act (220 ILCS 5/1-101 *et seq.* (West 2006)); (2) authorization for the construction, operation, and maintenance of a 36-inch diameter, underground oil pipeline pursuant to section 8-503 of the Utilities Act (*id.* § 8-503); and (3) authorization to enter upon, take, or damage private property in the manner provided by the law of eminent domain when necessary for the construction of the Extension Project pursuant to section 8-509 of the Utilities Act (*id.* § 8-509).

¶ 11 In July 2009, following a lengthy investigation and hearing, the ICC issued an order in Docket No. 07-0446. In the order, the ICC (1) granted IEPC a certificate in good standing; (2) authorized IEPC to construct, operate, and maintain the proposed 36-inch pipeline; and (3) authorized IEPC to operate as a common carrier by pipeline within an area 60 feet wide and extending approximately 170 miles along the proposed route identified in the application. The ICC denied IEPC's request for eminent domain authority and directed IEPC to continue negotiations with the landowners but indicated that IEPC could renew its request after

demonstrating that it had "made reasonable attempts to obtain easements, through good-faith negotiations."

¶ 12    Several affected landowners-intervenors appealed the ICC's order granting IEPC a certificate in good standing to the Fourth District Appellate Court. *Pliura Intervenors v. Illinois Commerce Comm'n*, 405 Ill. App. 3d 199, 200 (2010) (*Intervenors I*). On review, the Fourth District affirmed the ICC's order after rejecting the intervenors' arguments that the ICC improperly found that a public need for the pipeline existed and that IEPC was fit, willing, and able to construct, operate, and maintain the pipeline. *Id.* at 208-09. The Illinois Supreme Court subsequently denied the intervenors' petition for leave to appeal. *Pliura Intervenors v. Illinois Commerce Comm'n*, 239 Ill. 2d 589 (2011) (table).

¶ 13    In July 2013, IEPC filed a petition with the ICC (Docket No. 13-0446) renewing its request for eminent domain authority. In the petition, IEPC alleged that, although continued negotiations had reduced the number of "holdout" landowners from 148 to 127, the remaining landowners had either refused to negotiate or declined IEPC's compensation offers.

¶ 14    In December 2013, an administrative law judge (ALJ) held a hearing on IEPC's petition. At the hearing, an engineer employed by the ICC testified that, in order to obtain approval to exercise eminent domain authority, IEPC was required to show that reasonable attempts to acquire the land rights through the negotiation process had been made and that any future attempts would have been unsuccessful. The engineer further testified that the ICC would consider numerous factors in evaluating IEPC's negotiation efforts, including the following: (1) the number and extent of the IEPC's negotiations with the landowners, (2) whether the compensation offer was explained to the landowners, (3) whether the offered compensation was comparable to offers made to similarly situated landowners, (4) the efforts that were made to address the landowners' concerns, and (5) the probability that successful negotiations would be reached in the future. The engineer opined that IEPC had made sufficient efforts with regard to each factor and recommended approval of IEPC's petition for eminent domain authority. The ALJ subsequently issued a recommendation that the ICC grant IEPC eminent domain authority.

¶ 15    In April 2014, following a hearing, the ICC issued a written order in Docket No. 13-0446. In the order, the ICC accepted the recommendation of the ALJ and, pursuant to section 8-509 of the Utilities Act (220 ILCS 5/8-509 (West 2014)), authorized IEPC to seek eminent domain authority in accordance with the Act (735 ILCS 30/1-1-1 *et seq.* (West 2014)). In so doing, the ICC noted that its consideration of the factors had been complicated "to some extent" by the timing of IEPC's petition, which was filed more than four years after the underlying certificate was granted. The ICC concluded, however, that sufficient evidence had been presented to show that (1) IEPC made adequate contacts with the remaining landowners; (2) IEPC gave adequate explanations of its offered compensation to the landowners; (3) IEPC's offers for the easements, which were 125% of fee value, were comparable to, or above, offers made to similarly situated landowners; (4) IEPC had addressed the landowners' concerns by adjusting the pipeline route to avoid certain land features; and (5) it was unlikely that further negotiations would be successful, "given the large number of holdouts" and the lengthy negotiation phase.

¶ 16    In May 2014, IEPC filed a "Motion to Reopen and Amend Order Concerning Diameter of the [SAX] Pipeline" seeking ICC approval for an amendment to the July 2009 certificate in good standing issued in Docket No. 07-0446. Specifically, IEPC sought to reduce the SAX pipeline diameter from 36 to 24 inches. In support of this request, IEPC alleged that it had

reevaluated the original parameters of the pipeline in light of uncertain economic conditions and that the recent market demanded a different grade of crude oil. IEPC alleged that it originally estimated the pipeline would transmit 400,000 bpd, requiring a 36-inch pipeline diameter. Upon additional evaluation, however, IEPC concluded the pipeline would transmit approximately 300,000 bpd, requiring only a 24-inch pipeline diameter. IEPC explained that its approximation of 300,000 bpd was based upon its receipt of long-term contractual commitments from Marathon Petroleum Company (Marathon) and an additional, undisclosed oil shipper for an approximate volume total of 210,000 bpd. According to IEPC, the remaining capacity of 90,000 bpd would be available to other shippers of crude oil.

¶ 17        Shortly thereafter, several affected landowners-intervenors filed with the ICC an application for rehearing in Docket No. 13-0446, claiming that IEPC's motion to reopen and amend the order concerning the pipeline's diameter in Docket No. 07-0446 rendered its application for eminent domain authority in Docket No. 13-0446 moot. The ICC denied the application for rehearing, concluding that claims involving Docket No. 07-0446 were not properly before it in Docket No. 13-0446.

¶ 18        Several affected landowners-intervenors appealed the ICC's order authorizing IEPC to acquire the property by the law of eminent domain in Docket No. 13-0446 to the Fourth District. *Pliura Intervenors v. Illinois Commerce Comm'n*, 2015 IL App (4th) 140592-U, ¶ 3 (*Intervenors II*). On review, the Fourth District ultimately affirmed the ICC's order after rejecting the intervenors' argument that there was insufficient evidence showing that IEPC had engaged in good-faith negotiations. *Id.* ¶¶ 65-71.

¶ 19        In December 2014, before the Fourth District issued its decision in *Intervenors II*, the ICC issued an order amending the certificate in Docket No. 07-0446 following an evidentiary hearing on IEPC's motion to reopen and amend. After considering the evidence, the ICC determined that public convenience and necessity required issuance of an amended certificate authorizing the 24-inch pipeline. In so determining, the ICC found that a public need for the 24-inch pipeline existed, no other substantial changes had been proposed, and the size reduction would impose no additional burdens on the affected landowners. However, the ICC placed several restrictions on IEPC with regard to the remaining capacity and ownership interest of the pipeline. Specifically, the ICC prohibited IEPC from decreasing the capacity of the pipeline made available to shippers, other than Marathon, required IEPC to hold itself out to provide capacity to other shippers and precluded Marathon or its affiliates from increasing its 35% minority interest in IEPC to a controlling interest.

¶ 20        Several affected landowners-intervenors and IEPC filed separate appeals from the ICC's order amending the certificate in Docket No. 07-0446 with the Fourth District. *Pliura Intervenors v. Illinois Commerce Comm'n*, 2016 IL App (4th) 150084-U, ¶¶ 3-4 (*Intervenors III*). On review, the Fourth District consolidated the parties' appeals and affirmed the ICC's order. *Id.* ¶¶ 1-2. In doing so, the Fourth District rejected the intervenors' arguments that the ICC erred by amending the certificate because (1) the ICC's findings were unsupported by the evidence; (2) IEPC's certificate had expired; and (3) IEPC was no longer a common carrier by pipeline because it sold a 35% interest in the pipeline to Marathon and reduced the diameter of the pipeline, which essentially converted the project into a private pipeline that was not available to the public on an equal basis. *Id.* ¶¶ 35-53. The Fourth District also rejected IEPC's arguments that challenged the restrictions the ICC placed on the remaining capacity and ownership interests of the pipeline. *Id.* ¶¶ 61-68. The Illinois Supreme Court subsequently

denied the intervenors' petition for leave to appeal. *Pliura Intervenors v. Illinois Commerce Comm'n*, No. 120757 (Ill. Sept. 28, 2016); *Pliura Intervenors v. Illinois Commerce Comm'n*, No. 120835 (Ill. Sept. 28, 2016).

¶ 21                                    C. Circuit Court Proceedings

¶ 22    On July 9, 2014, prior to the ICC's ruling on IEPC's motion to reopen and amend, IEPC filed a "Complaint for Condemnation of Permanent and Temporary Easements for Common-Carrier Pipeline" against landowners. The complaint alleged that the ICC had issued an order granting IEPC a certificate in good standing and authorizing the construction, operation, and maintenance of the SAX pipeline for the transport of crude petroleum along an approved route. The complaint further alleged that the ICC had acknowledged that it would be necessary for IEPC to obtain both permanent and temporary easements to construct the pipeline along the approved route. The ICC order, which contained the detailed description of the approved route, was attached to the complaint as an exhibit.

¶ 23    IEPC acknowledged in the complaint that the ICC initially denied its request for eminent domain authority but stated that IEPC could renew the request after it had made reasonable attempts to obtain the easements through good-faith negotiations. IEPC clarified, however, that the ICC had since issued an order authorizing IEPC to acquire easement rights along the previously approved pipeline route by the law of eminent domain. IEPC described the specific easement rights approved in the second ICC order and alleged that such easement rights would serve public convenience and necessity. IEPC attached the second ICC order to the complaint as an exhibit.

¶ 24    IEPC alleged in the complaint that the approved route traversed the parcel of land, designated as FP-13-020, owned by landowners. The legal description of landowners' property was attached to the complaint as Exhibit C. IEPC clarified that it sought both "a 60-foot wide perpetual easement for the aforementioned purposes over, under, and across part of the parcel described in detail in Exhibit C" and "a 60-foot wide temporary easement for workspace purposes over, under, and across part of said parcel, as described in detail in Exhibit C."

¶ 25    IEPC also alleged in the complaint that it had made attempts to negotiate with landowners on the amount of compensation to be paid for the easement rights beginning in 2006, with an expanded effort starting in July 2012. These negotiation efforts included in-person meetings and an exchange of written correspondence, in which IEPC explained the pipeline project, described the necessary easements, and provided additional data required by ICC regulations. A letter was sent to landowners on May 22, 2013, offering to purchase the necessary permanent and temporary easement rights for a sum of $37,160. IEPC's offer encompassed the full fee value of the area needed for the permanent easement and at least 30% of the value for the areas needed as temporary workspace easements. IEPC alleged that the offer was based on a professional study of real estate values in the area around landowners' tract. In a standard easement agreement, IEPC had also offered landowners payment for crop losses and incidental construction damage, which increased the offer to $37,734. IEPC further alleged that landowners were sent a "final-offer" letter on May 19, 2014, in which IEPC requested a response within a "reasonable time" and advised landowners that it would thereafter initiate judicial proceedings under the Act. The final-offer letter, which was attached to the complaint as an exhibit, lists the same offer of $37,734. Despite these efforts, IEPC claimed it was unable to reach an agreement with landowners, making it necessary to file the condemnation action.

Accordingly, IEPC requested that just compensation be ascertained following a jury trial and that the circuit court enter an order allowing IEPC to "enter upon and use the pipeline right-of-way easements upon payment of the just compensation" to landowners.

¶ 26 On July 28, 2014, landowners filed a traverse motion alleging as follows:

"1. That [IEPC] is not properly vested with authority to acquire the property of [landowners] by proceeding in eminent domain.

2. That the property sought to be acquired in this proceeding is not necessary or convenient for the purpose for which it is sought to be taken.

3. That the amount of property sought to be taken by [IEPC] herein is in excess of [IEPC's] needs.

4. That [IEPC] does not seek to use the property sought to be acquired by this proceeding for a public purpose.

5. That there has been no *bona fide* attempt to agree with [landowners] as to the just compensation and damages to be paid for the property sought to be taken.

6. That the project for which [IEPC] seeks to acquire the lands of [landowners] does not constitute a public convenience or necessity.

7. That the project does not constitute a common carrier because of restrictions on access to the proposed pipeline.

8. That [IEPC's] authority to acquire the property by eminent domain is limited to a project that [IEPC] is no longer pursuing and is not transferable to a new and different project.

9. That [IEPC] does not possess the legal authority to construct the pipeline it intends to construct on the property of [landowners] because it has no certificate in good standing from the [ICC] for the project it is pursuing and the certificate it previously obtained is expired and is not transferable to a different project."

¶ 27 On August 22, 2014, IEPC filed a response, asserting that landowners' traverse motion was legally defective and unsupported. IEPC also asserted that the traverse motion contained erroneous and false allegations that rendered it "incapable of being granted." Contrary to landowners' assertion, IEPC claimed that the ICC issued a valid and enforceable order in Docket No. 07-0446, granting IEPC a certificate in good standing and authorizing IEPC to construct the pipeline along the proposed route. IEPC, relying on *Intervenors I*, alleged that the Fourth District had rejected arguments similar to those made in landowners' traverse motion, including claims "that the [ICC] erred by determining that (1) [IEPC] was fit, willing, and able to construct, operate, and maintain an oil pipeline and (2) a public need for the pipeline existed." 405 Ill. App. 3d at 200. In addition, IEPC alleged that, pursuant to the Act, it had authority to construct the pipeline because the ICC's order enjoyed a statutory presumption that the acquisition of the property was (1) primarily for the benefit, use, or enjoyment of the public and (2) necessary for a public purpose. Thus, IEPC argued that the ICC order was "*prima facie* evidence of the necessity for taking private property for a public purpose" and that landowners were required to meet their burden of showing that the ICC "clearly abused its discretion" regarding the necessity of the taking.

¶ 28 IEPC also alleged that the ICC issued a valid and enforceable order in Docket No. 13-0446, granting IEPC authority to acquire property through eminent domain. IEPC claimed that landowners' motion was an improper collateral attack on the ICC's order, given that it

requested the circuit court to "overturn the decision of the [ICC] by determining that [IEPC] lacks eminent domain authority." With regard to landowners' claim that IEPC was pursuing a different project not covered by the ICC order, IEPC alleged that it had filed a motion with the ICC to amend its certification to change the size of the diameter of the pipeline from 36 inches to 24 inches. Although the motion remained pending with the ICC, IEPC asserted that landowners' argument was unsupported by law or fact and that multiple jurisdictions had rejected similar contentions.

¶ 29 Next, IEPC argued that it had negotiated with landowners in good faith for the easements. IEPC claimed that the pipeline traversed 679 tracts of land and that it had acquired all but 127 of the tracts through the negotiation process. According to IEPC, the offers made to all landowners for the permanent easements represented 125% of the per acre fee simple value of their respective properties, and the offers made for the temporary easements represented 50% of the per acre fee simple value. IEPC asserted that the ICC had rejected the collective contention of all affected landowners that IEPC had failed to negotiate in good faith after John McKay, IEPC's manager of land services, had testified that the offers were based on land value studies and other unique factors of the particular properties. IEPC attached an affidavit prepared by McKay, which set forth the basis for IEPC's offers in detail, as an exhibit to its response. IEPC also asserted Joseph Batis, a licensed real estate appraiser, had testified that he prepared the land market study based on land sales data in compliance with professional standards and that IEPC's offers exceeded the value of the easement. IEPC attached an affidavit prepared by Batis, which summarized his testimony, as an exhibit to its response.

¶ 30 IEPC further argued that it had sent landowners a letter conveying a final offer of $37,734, which was attached as an exhibit to its response. IEPC asserted that landowners did not respond to the final offer and failed to provide any other appraisal value that would refute IEPC's offer. As a final point, IEPC contended that landowners' traverse motion was unsupported by any evidence or law.

¶ 31 On October 21, 2014, landowners filed a reply memorandum to IEPC's response. In their reply, landowners asserted that they were entitled to discovery followed by a full evidentiary hearing on the issues disputed in their traverse motion. According to the landowners, the ICC order was insufficient to establish eminent domain authority when the ICC had initially approved a 36-inch diameter pipeline to transport heavy crude oil from Canada to the Midwest, but IEPC had since decided to reduce the diameter of the pipeline to 24 inches to transport light crude oil from North Dakota. Attached as an exhibit to their reply memorandum was the direct testimony of Carlisle Kelly, an intervenor who testified during the ICC proceedings in opposition of the motion to amend, which remained pending before the ICC. Landowners further claimed that the 60-foot-wide easements were excessive, given the reduced diameter of the pipeline.

¶ 32 Landowners also asserted that IEPC was not operating as a common carrier because 90% of the pipeline's capacity was contracted to two shippers with only 10% reserved for noncommitted shippers. While landowners were aware that Marathon was one of the committed shippers, IEPC had not disclosed the identity of the second committed shipper or provided information regarding the shipping capacity of each committed shipper. Landowners argued that IEPC would neither constitute a common carrier nor qualify to obtain their property through eminent domain if 90% of the pipeline's capacity was committed to shipping product owned by IEPC's owners or affiliates. Thus, landowners asserted that discovery was necessary

to ascertain the identity of the undisclosed shipper and the percentage of the pipeline's capacity that was contracted to each shipper. While landowners acknowledged the ICC had found a public need for the pipeline—to provide access to a secure and reliable energy supply—landowners argued that the ICC had failed to identify a shortage of energy supplies creating an actual public need for a secure and reliable energy source. Landowners also claimed that the ICC's interpretation was overly broad and was based on speculation that the project would actually provide a secure and reliable energy supply.

¶ 33    Finally, landowners alleged that IEPC had failed to make a reasonable attempt to determine the fair market value of the landowners' specific property prior to filing the condemnation action, instead, relying on a "highly general" land market study to formulate its offers. While acknowledging that IEPC did base its offers on the land market study, landowners argued that IEPC never explained how the land market study was used in formulating its offers. Landowners further alleged that they were unable to properly evaluate IEPC's offers because IEPC required a response within 10 days. For these reasons, landowners claimed that IEPC failed to engage in good-faith negotiations.

¶ 34    On January 27, 2015, the circuit court addressed landowners' traverse motion at a hearing. Landowners again argued that they were entitled to a full evidentiary hearing following relevant discovery on issues disputed in the traverse motion. Although landowners acknowledged that IEPC had provided some discovery, they represented that IEPC had objected to numerous discovery requests, including those relevant to the issues of "public-use" and good-faith negotiations. Specifically, landowners claimed that information regarding the identities and contracted shipping capacity of each committed shipper would support the public-use argument in their traverse motion. Landowners also sought to depose Batis regarding his land market study and McKay regarding the method IEPC utilized in formulating its offer to landowners. The court granted landowners' request to depose Batis and McKay but limited the scope of the depositions to good-faith negotiations, public use, and whether the taking was excessive.

¶ 35    Following the depositions of Batis and McKay, landowners filed a motion to stay proceedings and a motion to compel. Landowners sought an order staying the traverse hearing, which was scheduled for February 24, 2015, until the parties received the deposition transcripts. Landowners also sought to stay the traverse hearing until the circuit court issued a ruling on their motion to compel, in which landowners alleged that they were unable to conduct proper depositions and discover relevant information due to IEPC's repeated objections during the depositions and written objections to requests for certain documents in the rider attached to the deposition notice. Specifically, landowners claimed that they were unable to discover information relating to the following: (1) the entities that currently have an ownership interest in IEPC, (2) the number and identity of shippers currently contracted to ship on the SAX pipeline, (3) any anticipated maintenance procedures affecting their property, (4) IEPC's attempts to obtain contract shippers during the "open season" periods and the results of such efforts, (5) the anticipated destination of the products shipped through the SAX pipeline, (6) the anticipated benefits that the SAX pipeline will bring to the public, and (7) the difference in benefits and impact of the 24-inch pipeline as compared to the 36-inch pipeline.

¶ 36    On February 24, 2015, the circuit court addressed landowners' motions at the hearing originally set on their traverse motion. Landowners claimed that they had received a digital transcript of the depositions but had not yet received the exhibits used in Batis's deposition,

which contained information about the land market study. Landowners argued that IEPC failed to produce the documents requested in the rider, which were related to the ownership interests in the pipeline, the identity of the shippers, and the contracted capacity of each shipper.

¶ 37     In response, IEPC noted there was "no Supreme Court Rule 201(k) compliance" prior to the filing of landowners' motion to compel. While IEPC acknowledged receiving landowners' phone call to discuss discovery compliance, IEPC noted that the discussion took place after the filing of the motion to compel. IEPC further argued that it had produced 71 pages of documents showing the logs of all contacts with landowners, along with the schematics of the easement and construction equipment. In addition, IEPC asserted that landowners improperly served the deposition notice and attached rider. According to IEPC, many of the documents sought in the rider either were contained in the 3000 pages of discovery that had already been produced or were protected by a confidentiality order issued by the ICC. IEPC represented that information relating to the identity of the shippers and the capacity contracted to each shipper was "clearly within the protective order." Moreover, IEPC argued that the landowners' attorney, who represented other landowners in other proceedings involving IEPC, was attempting, as in the other proceedings, to have the circuit court conduct a *de novo* review of the ICC's order, along with the Fourth District's decision affirming that order. IEPC also pointed out that multiple jurisdictions had denied traverse motions without discovery.

¶ 38     Following a brief recess, the circuit court denied landowners' motion to compel stating that there was no "good basis to grant that motion." The court also found that landowners failed to include a statement that counsel had personally consulted with opposing counsel and made attempts to resolve differences prior to filing the motion, as required by Illinois Supreme Court Rule 201(k) (eff. July 1, 2014). The court concluded that landowners' efforts following the filing of their motion did not satisfy the procedural requirements. The court granted landowners' motion for stay "for a very limited time," stating that, although it was troubled that the traverse motion remained pending, it was reasonable for the landowners to have transcripts of the depositions, along with copies of the exhibits, for use in the proceedings on the traverse motion. Although there was a brief dispute between the parties regarding the necessity of an evidentiary hearing on the motion, the court did not rule on that issue.

¶ 39     On March 11, 2015, the circuit court held a hearing on landowners' traverse motion. The parties first disputed the procedure that should be followed by the court in conducting the hearing. Landowners asserted that IEPC was required to present evidence establishing a *prima facie* case for condemnation when faced with a traverse motion, while IEPC argued that, pursuant to the Act, the ICC certificate filed with the complaint established a *prima facie* case and, thus, shifted the burden back to landowners to present evidence. Landowners disagreed, arguing that the ICC certificate did not shift the burden "because the burden to prove that [IEPC] acted in good faith is not a consideration at the ICC level." Accordingly, landowners asserted that IEPC had "the burden to show that [it] made a good faith *bona fide* offer submitting evidence in that regard," which would allow landowners to cross-examine IEPC's witnesses and challenge that evidence.

¶ 40     IEPC claimed that landowners' argument was rejected by the Fourth District in *City of Springfield v. West Koke Mill Development Corp.*, 312 Ill. App. 3d 900 (2000), and that the circuit court should consider landowners' traverse motion as a section 2-619(a)(9) motion to dismiss (735 ILCS 5/2-619(a)(9) (West 2014)). IEPC further argued that landowners had failed to meet their burden on the motion because they cited no legal authority and had failed to attach

- 10 -

evidence in support of their motion. Moreover, IEPC argued that landowners' claims were not properly before the court and were, instead, an attempt to have the court review the ICC's findings *de novo*. IEPC maintained that landowners were required to show by clear and convincing evidence that the ICC abused its discretion.

¶ 41    In addition, IEPC argued that overwhelming evidence showed good-faith negotiations with landowners. According to IEPC, the depositions of McKay and Batis evidenced that IEPC's offers were above the appraised value. Landowners objected, arguing that an evidentiary hearing was required on the traverse motion and that IEPC was required to present witness testimony that was subject to cross-examination. The court then clarified its understanding was "that it [was] a 2-619 motion hearing." In concluding, IEPC argued that McKay's affidavit established good-faith negotiations.

¶ 42    In response, landowners argued that the depositions showed IEPC relied on a general study of surrounding properties in formulating its offers without obtaining an appraisal on landowners' specific property. According to landowners, IEPC did not appraise their property until after it had filed the condemnation action. Landowners further asserted that a counteroffer and further negotiations had taken place in June, which resulted in IEPC making a significantly higher offer. However, landowners denied that these offers and counteroffers were suggestive of good-faith negotiations because IEPC had initially made "low ball" offers without appraising their property or providing the landowners with a basis for the offers. Landowners also asserted that IEPC lacked authority to acquire their property through eminent domain because the IEPC's certificate in good standing had expired and IEPC had changed the proposed project.

¶ 43    Landowners represented that they had witnesses present at the hearing who were prepared to testify in support of their traverse motion. In response to the circuit court's inquiry about their failure to file supporting counteraffidavits, landowners claimed that, unlike a section 2-619 motion hearing, they were entitled to present evidence at a traverse hearing. The court disagreed and made the following statements:

> "I said fairly quickly from the outset this is treated like a 2-619 hearing. I'm not going to take any evidence, I mean, for a variety of reasons. I've taken a look at everything that's been in the court file. This is a five binder file. There's been a lot of things that have been filed with it. It doesn't appear that this case has gone anywhere at all since it was filed."

The court ruled that it would not hear any testimony but allowed landowners to make an offer of proof.

¶ 44    In making their offer of proof, landowners' attorney indicated that one landowner, Mr. Murfin, would have testified to the following details. Because IEPC provided neither an appraisal of his property nor a copy of the market study, Mr. Murfin believed that IEPC had not obtained an appraisal or study of his particular property prior to the filing of the condemnation action. He responded to IEPC's initial offer of $37,734 by authorizing his attorney to engage in discussions with IEPC. IEPC then made an offer that was much higher but later reduced its final offer back to $37,734.

¶ 45    Landowners' attorney indicated that Kelly would have testified to the following details. Kelly testified in both ICC proceedings (Docket Nos. 07-0446 and 13-0446) and was familiar with those proceedings because he owned property along the same pipeline route. Although IEPC received certificates from the ICC in July 2008, IEPC did not move forward with the

project for over two years. IEPC had since altered the project by reducing the diameter of the pipeline from 36 inches to 24 inches and changing the product shipped through the pipeline. Kelly opined that Marathon had purchased a 35% interest in IEPC with an option to exceed that percentage in ownership. According to Kelly, IEPC was no longer a public common carrier pipeline because Marathon had also contracted for nearly 95% of the shipping capacity of the SAX pipeline. The SAX pipeline would ship Marathon's petroleum products from the Dakotas to Patoka, Illinois. Marathon would then ship its petroleum to its refineries in Robinson, Illinois, to make gasoline and diesel products for Marathon-owned gas stations. In Kelly's opinion, such use did not meet the criteria for public use to exercise eminent domain authority.

¶ 46　　IEPC orally moved to strike the offer of proof, arguing that it was hearsay, incompetent, unqualified, baseless, speculative, and otherwise not supported by any evidence. The circuit court denied IEPC's oral motion.

¶ 47　　Based on its review of the pleadings, motions, and caselaw, the circuit court denied landowners' traverse motion, "treated as 2-619 motion." In doing so, the court found that (1) a valid public use existed, (2) IEPC had the legal authority to construct the pipeline, (3) IEPC had the authority to act in all other respects, and (4) IEPC engaged in good-faith negotiations with landowners.

¶ 48　　On June 18, 2015, landowners filed an amended answer to the complaint and a counterclaim for damages to the remainder. On June 23, 2015, IEPC filed numerous motions *in limine* seeking, *inter alia*, the following: (1) to bar landowners' testimonies relating to valuation and remainder damage; (2) to exclude landowners' personal opinions concerning fair market value and damage to the remainder; (3) to exclude landowners' testimonies relating to personal value of the land, prior interactions with pipeline companies, and the possibility of IEPC expanding the pipeline or the possibility of IEPC constructing additional pipelines; (4) to exclude argument or evidence relating to hydrostatic testing and IEPC's contractor safety program; (5) to exclude testimony or argument regarding pipeline maintenance, which was covered by IEPC's evidentiary stipulation; and (6) to exclude testimony, evidence, and argument relating to IEPC's ability to mortgage the easement.

¶ 49　　On June 30, 2015, the circuit court addressed IEPC's motions *in limine* at a pretrial hearing. After hearing the parties' arguments, the court reserved ruling on IEPC's request to exclude any testimony relating to valuation and remainder damage that was based on consideration of previous pipeline spills, explosions, or leaks. The court denied IEPC's request to exclude landowners' testimony regarding the personal value of their property but granted IEPC's request to exclude their testimony regarding the possibilities of expanding the pipeline or constructing additional pipelines. While the court agreed that landowners were not "controlled experts," the court reserved ruling on the limitations that could be placed on their respective testimonies at trial. The court also granted IEPC's request to exclude testimony relating to IEPC's ability to mortgage the easement and evidence of hydrostatic testing or IEPC's safety manual.

¶ 50　　On July 27, 2015, the case proceeded to a jury trial. Over the course of several days, the parties presented numerous exhibits and testimony from several witnesses, including McKay, Lance Lunte, Mr. Murfin, Michael McCann, and Batis.

¶ 51　　McKay, an Enbridge employee, testified to the following details on behalf of IEPC. McKay initially provided a detailed description of his work history and job duties with Enbridge, which he described as an entity primarily in the business of transporting crude oil through

underground pipelines. In 2006, McKay began working for Enbridge as a "right-of-way agent" in Wisconsin, North Dakota, Minnesota, and Michigan. In that capacity, McKay worked with landowners and pipeline maintenance crews along the routes for various projects within the region. McKay was subsequently promoted to "Supervisor of Operations for Land Services." In that capacity, his responsibilities included "oversight of all of the U.S. right-of-way agents in the various regions." In his current role, he provides oversight relating to the land components of all United States projects, including the acquisition of land rights, planning, design, construction, and restoration. McKay explained that he had been a certified general road property appraiser in Minnesota from 1992 to 2010, but he "let that license go" because he was not required to perform appraisals in his job duties at Enbridge.

¶ 52    McKay then testified regarding Enbridge's business operations and assets located in Illinois. McKay clarified that, although Enbridge currently owns underground pipelines and storage facilities in Illinois, it does not own the crude oil transported through the pipelines. McKay explained that Enbridge, like a trucking company, delivers, or transports, the crude oil for shippers at certain rates. The rates charged, as well as the construction, maintenance, and operation of pipelines, are regulated by the federal government and the ICC. IEPC, an Enbridge entity and public utility that transports crude oil subject to such regulations, acquired easement interests in the landowners' property to construct the SAX pipeline following a determination by the ICC that a public need for the pipeline exists.

¶ 53    McKay also provided specific details regarding the permanent and temporary easements necessary for the construction of the pipeline on the landowners' property, including the total acreage and duration of each easement. McKay then highlighted the extensive research performed in developing opinions about the values of property along the pipeline route, which spans approximately 170 miles. Based on this research, Enbridge develops an opinion regarding the general market value of property in certain areas. If eminent domain proceedings are necessary, "we do a lot more research and work that goes into hiring professional appraisers, as an example, to develop those opinions of value." McKay directed that appraisers hired for the SAX project would have a certain designation, in addition to the required license, as evidence of their qualifications.

¶ 54    Lunte, IEPC's appraiser, testified to the following details. At the time of the trial, Lunte was employed by Lochmueller Group, an engineering company, as an associate and senior appraiser. In recent years, Lunte worked on a significant amount of land acquisitions involving eminent domain proceedings. In October 2013, after an Enbridge representative spoke with Lunte about the SAX project, Lunte attended general meetings "to try to determine what was involved with the project and how [he] could be of service, you know, providing appraisal work or research or what was the scope of the project." After familiarizing himself with the three pipeline segments involved in the SAX project covering 1900 parcels of land, Lunte focused on the Extension Project, which traverses 750 parcels in Livingston, McLean, De Witt, Macon, Shelby, Christian, Fayette, and Marion Counties. At the beginning of the process, Lunte performed only market research, which included collecting data regarding property sales with and without pipelines, different uses of properties with and without pipelines, as well as interviewing property owners along the pipelines. The data did not pertain to any particular property but was a general study on the properties situated near the SAX pipeline.

¶ 55    Lunte then testified regarding the general steps in the appraisal process. Although the process varies depending on the type of property, the process generally begins by considering

a general market area and then looking at the specific neighborhood to determine whether the location of the property would have an effect on the value. The next step involves consideration of a property's specific characteristics, including land size or improvements that would impact the market value. In the third step, an appraiser estimates the highest and best use—the use that would return the highest market value as of the effective date of the report. Lunte explained that market value has many definitions, but the term is generally understood as "what a willing buyer would pay in cash and a willing seller would accept" without compulsion to buy or sell. While Lunte noted three approaches to estimate value, he explained that the sales comparison approach is the best approach to estimate value for the subject property. That approach involves a comparison of the subject property with comparable properties which have sold. A conclusion of value for the subject property can be based on the sales prices of the comparable properties following adjustments for different items that affect the value of the comparable properties. After estimating the value of the whole property based on its highest and best use in cases of a partial acquisition, it is appropriate to consider the property values before and after the acquisition.

¶ 56    Lunte testified that he followed the appraisal process when he ultimately prepared an appraisal on landowners' property. In doing so, he collected data and observed the specific characteristics when he inspected their property on November 5, 2014. He utilized the comparable sales approach and determined that the fair market value of landowners' "whole" property, including the house and additional structures, was $978,000. After considering the property values before and after the acquisition, Lunte opined that the fair market value of the permanent easement was $5500 and the value of the temporary easement was $3500. According to Lunte, the combined value of the easements totaled $9000 with no damage to the remainder.

¶ 57    Mr. Murfin then sought to testify to the value of his property. On IEPC's motion, the circuit court allowed a *voir dire* of Mr. Murfin. During the *voir dire*, Mr. Murfin stated that his 60 acres of property was valued at $1.53 million. Mr. Murfin also stated his opinion of 30% remainder damage, or $409,000, included consideration of "a risk of rupture," limitations on future expansions, risks associated with construction, and Internet research. While the court permitted Mr. Murfin to testify regarding the value of his property, the court reiterated that its prior *in limine* rulings had excluded testimony regarding Internet research, future expansions, and the possibility of pipeline ruptures as bases for damages. Thus, the court restricted Mr. Murfin from testifying on issues of damage to the remainder relating to the following: (1) hydrostatic testing and the IEPC contractor safety program, (2) Internet research conducted by Mr. Murfin, (3) conversations with real estate brokers or farm managers, (4) fears of pipeline ruptures, (5) any comparable sales data he may have found to arrive at his conclusion of fair market value on his subject property, or (6) any testimony that was inconsistent with the ruling in *Trunkline Gas Co. v. O'Bryan*, 21 Ill. 2d 95 (1960).

¶ 58    Landowners then called their valuation expert, McCann, who testified that just compensation for the SAX pipeline easements totaled $230,905. No further testimony was offered by landowners.

¶ 59    IEPC then called a rebuttal witness, Batis, who testified to the following details. At the time of the trial, Batis had worked as a real estate appraiser and consultant for 32 years. Although Batis worked on previous projects for Enbridge, his most recent work for Enbridge, which involved the SAX pipeline, began in 2012. Batis conducted various types of market

research and other duties, including preparing appraisals on properties along the pipeline route. Most of the work Batis performed for Enbridge involved market or impact studies, which are distinguishable from appraisals "in that the analysis doesn't pertain to any one or single property or value concerning a property." After collecting extensive data, Batis concluded that there is no discernable loss in value in every case when a pipeline is crossing property that results in reduction of value. On cross-examination, Batis admitted that his office received, on average, $150,000 per month from Enbridge's attorneys' office.

¶ 60    After the jury went to the site and viewed landowners' property, the parties presented closing arguments. IEPC asked the jury to award $9000, while landowners asked for an award of $230,905. Following deliberations, the jury returned a verdict of $59,000 for landowners, and the circuit court entered a judgment in that amount.

¶ 61    On August 28, 2015, landowners filed a posttrial motion, asserting that the circuit court erred in several respects during both the preliminary and trial proceedings. Specifically, landowners claimed that the court erred by (1) treating their traverse motion as a section 2-619 motion to dismiss, (2) ruling IEPC's certificate granted IEPC eminent domain power, (3) ruling IEPC's pipeline project was for a public use and purpose, and (4) ruling IEPC negotiated with landowners in good faith. With regard to the trial proceedings, landowners claimed the court erred by (1) barring Mr. Murfin from testifying regarding the risk and fear of pipeline dangers, (2) barring the testimony of two additional witnesses, and (3) restricting cross-examination of IEPC's witnesses regarding the terms of the easement. The court subsequently denied the motion, and this appeal followed.

## II. Analysis

¶ 62

¶ 63    On appeal, landowners challenge several rulings made by the circuit court during the course of the eminent domain proceedings, including both the preliminary traverse proceedings and subsequent trial proceedings. As a preliminary matter, we address two motions we ordered taken with the case—IEPC's motion for sanctions and IEPC's motion to strike certain sections of landowners' brief. We begin by summarizing the legal principles applicable to the motions and issues raised on appeal.

¶ 64    "Condemnation, or eminent domain, is the process by which the government takes private property for public purposes subject to payment of just compensation." *City of Chicago v. Eychaner*, 2015 IL App (1st) 131833, ¶ 51 (citing *Village of Bellwood v. American National Bank & Trust Co. of Chicago*, 2011 IL App (1st) 093115, ¶ 18). "The United States Constitution, the Illinois Constitution, and [the Act] all prohibit the government from taking private property for public use without paying just compensation." *Enbridge Energy, Ltd. Partnership v. Fry*, 2017 IL App (3d) 150765, ¶ 46 (citing U.S. Const., amend. V, Ill. Const. 1970, art. I, § 15, 735 ILCS 30/10-5-5 (West 2014), and *City of Chicago v. Midland Smelting Co.*, 385 Ill. App. 3d 945, 964 (2008)). While the State has the inherent authority to exercise the power of eminent domain, other private entities or departments of the government can exercise the power of eminent domain only when such grant has been specifically conferred by legislative enactment. *Department of Public Works & Buildings v. Ryan*, 357 Ill. 150, 154 (1934); *MCI WorldCom Communications, Inc. v. METRA Commuter R. Division of the Regional Transportation Authority*, 337 Ill. App. 3d 576, 580 (2003). Moreover, "the law conferring the authority must be strictly construed to protect property owners." *MCI WorldCom Communications, Inc.*, 337 Ill. App. 3d at 580.

¶ 65    In January 2007, our legislature enacted the current version of the Act and repealed article VII of the Code, which had previously governed eminent domain proceedings. See Pub. Act 94-1055, § 95-1-5 (eff. Jan. 1, 2007) (repealing 735 ILCS 5/7-101 to 7-129). Section 5-5-5(a) of the Act now provides that "a condemning authority may not take or damage property by the exercise of the power of eminent domain unless it is for a public use, as set forth in this Section." 735 ILCS 30/5-5-5(a) (West 2014). Our legislature also added section 5-5-5(c), which now requires a condemning authority seeking to exercise eminent domain authority to acquire property for private ownership or control to prove by clear and convincing evidence that the acquisition is "(i) primarily for the benefit, use, or enjoyment of the public and (ii) necessary for a public purpose." *Id.* § 5-5-5(c). However, subsection (c) also includes the following provision:

> "Evidence that the [ICC] has granted a certificate or otherwise made a finding of public convenience and necessity for an acquisition of property (or any right or interest in property) for private ownership or control (including, without limitation, an acquisition for which the use of eminent domain is authorized under the Public Utilities Act, the Telephone Company Act, or the Electric Supplier Act) to be used for utility purposes creates a rebuttable presumption that such acquisition of that property (or right or interest in property) is (i) primarily for the benefit, use, or enjoyment of the public and (ii) necessary for a public purpose." *Id.*

¶ 66    The Act also sets out the general procedures that should be followed when a landowner disputes a taking, including the filing of a condemnation action and a potential jury trial on the issue of just compensation. 735 ILCS 30/art. 10 (West 2014). Pursuant to section 10-5-10(a) of the Act, a party seeking to exercise the power of eminent domain to acquire a landowner's property may file a complaint for condemnation in the circuit court where the property is situated when, among other things, "the compensation to be paid for or in respect of the property sought to be appropriated or damaged for the purposes mentioned cannot be agreed upon by the parties interested." *Id.* § 10-5-10(a). The Illinois Supreme Court interpreted a similar provision in the prior statutory scheme governing eminent domain proceedings as requiring a condemning authority to negotiate with a landowner in good faith regarding an amount of compensation prior to filing a condemnation action. See *Department of Transportation ex rel. People v. 151 Interstate Road Corp.*, 209 Ill. 2d 471, 480 (2004).

¶ 67    Section 10-5-5(a) of the Act reiterates that "[p]rivate property shall not be taken or damaged for public use without just compensation" but adds that, "in all cases in which compensation is not made by the condemning authority, compensation shall be ascertained by a jury, as provided in this Act." 735 ILCS 30/10-5-5(a) (West 2014). The sole issue before the jury at trial is the amount of just compensation (*Illinois State Toll Highway Authority v. Dicke*, 208 Ill. App. 3d 158, 172 (1991)), which is the market value of the property on the date of the filing of the condemnation complaint. *Department of Transportation v. Dalzell*, 2018 IL App (2d) 160911, ¶ 67 (citing *Department of Transportation v. White*, 264 Ill. App. 3d 145, 149-50 (1994)). When a landowner files a separate claim asserting that the remainder of his or her property has been damaged by the taking, the jury may also be tasked with assessing an appropriate amount of compensation for damage to the remainder that resulted from the taking. *Id.* ¶ 68.

¶ 68    While not mentioned in the Act, Illinois courts have long recognized that a landowner faced with a condemnation action "has the undoubted right to contest the petitioner's right to

- 16 -

condemn" before proceeding to trial on the issue of just compensation. *Department of Public Works & Buildings v. Lewis*, 344 Ill. 253, 255 (1931). A landowner may challenge a condemnor's authority by filing a traverse motion seeking dismissal of the condemnation action. *Forest Preserve District of Du Page County v. Miller*, 339 Ill. App. 3d 244, 250 (2003). A traverse motion "is a common law instrument that has been around since long before the adoption of the Code; [thus,] not every section of the Code is applicable to a traverse." *Id.* at 252. A proceeding on a traverse motion is a preliminary proceeding that should be decided by the circuit court without a jury prior to a trial on the issue of just compensation. See *Chicago Land Clearance Comm'n v. White*, 411 Ill. 310, 314 (1952); *City of Naperville v. Old Second National Bank of Aurora*, 327 Ill. App. 3d 734, 739 (2002).

¶ 69                                  A. Open Motions

¶ 70        IEPC filed a motion for sanctions against landowners' attorney, pursuant to Illinois Supreme Court Rule 375(b) (eff. Feb. 1, 1994). IEPC claims that this court should impose sanctions against landowners' attorney for making misleading statements regarding his knowledge of the SAX shipping contracts, misleading this court by falsely claiming that he needs discovery on landowners' traverse motion, and attempting to endlessly relitigate issues that have been addressed and resolved by both the ICC and Fourth District.

¶ 71        Under Rule 375(b), a reviewing court may impose sanctions against a party, or a party's attorney, if it is determined that an appeal is "frivolous," "not taken in good faith," or "to harass or to cause unnecessary delay or needless increase in the cost of litigation." *Id.* An appeal may be considered frivolous if "not reasonably well grounded in fact and not warranted by existing law or a good-faith argument for the extension, modification, or reversal of existing law." *Id.* "The imposition of Rule 375 sanctions is left entirely to the discretion of the reviewing court." *Parkway Bank & Trust Co. v. Korzen*, 2013 IL App (1st) 130380, ¶ 87 (citing *Kheirkhahvash v. Baniassadi*, 407 Ill. App. 3d 171, 182 (2011)).

¶ 72        Although we agree that landowners have made misleading statements regarding the circuit court's denial of discovery prior to the traverse hearing, we decline to impose sanctions under Rule 375. Contrary to landowners' general contention that the court denied them "the ability to acquire evidence in the form of discovery" prior to the traverse hearing, the record, here, clearly shows that the court allowed limited discovery prior to the traverse hearing. Landowners deposed two of IEPC's witnesses and filed a motion to compel, asserting that IEPC had failed to produce certain documents requested in a rider to the subpoena for a deposition. Specifically, documents that would reveal the identities of the shippers and the amount of product those shippers would be shipping through the pipeline. Following a hearing, the court denied landowners' motion to compel, stating both that there was no good basis to grant the motion and that landowners had failed to comply with Illinois Supreme Court Rule 201(k) (eff. Jan. 1, 2013).

> " 'A reviewing court is entitled to have issues clearly defined with pertinent authority cited and cohesive arguments presented [citation], and it is not a repository into which an appellant may foist the burden of argument and research [citation]; it is neither the function nor the obligation of this court to act as an advocate or search the record for error.' " *People v. Universal Public Transportation, Inc.*, 2012 IL App (1st) 073303-B, ¶ 50 (quoting *Obert v. Saville*, 253 Ill. App. 3d 677, 682 (1993)).

- 17 -

Because landowners' general claim that the court denied discovery is unsupported by the record and they do not adequately address the court's ruling on their motion to compel, we will not consider their argument concerning discovery on appeal. See Ill. S. Ct. R. 341(h)(7) (eff. Feb. 6, 2013) ("Points not argued are waived and shall not be raised in the reply brief, in oral argument, or on petition for rehearing.").

¶ 73    Moreover, based on our research and extensive review of the record on appeal, we cannot say that landowners' appeal is frivolous, not taken in good faith, or brought for the primary purpose of delaying, harassing, or causing needless expense. The instant appeal comes before this court following a complex and lengthy litigation history between IEPC and numerous property owners along the pipeline route. The issues on appeal have been complicated by the unusual procedural history of the litigation concerning the pipeline, which involves numerous, and at times simultaneous, proceedings before the ICC, the Fourth District, and circuit courts in multiple counties. While the caselaw provided little guidance on these complicated issues at the time landowners filed the instant appeal, several courts have since considered similar facts and provided guidance on these issues in decisions issued while the present appeal was pending before this court. In fact, IEPC filed its motions for sanctions with its motion to address one of these decisions—the Fourth District's decision in *Enbridge Energy (Illinois), L.L.C. v. Kuerth*, 2016 IL App (4th) 150519—following this court's inquiry at oral argument. Given the lengthy litigation history between the parties, complexity of the issues involved, and lack of clarity in the caselaw at the time landowners filed the instant appeal, we find that sanctions against landowners' attorney would be inappropriate. Thus, we hereby deny IEPC's motion for sanctions against landowners' attorney.

¶ 74    IEPC has also filed a motion to strike sections III, IV, VI, and VII of landowners' brief, which include arguments regarding IEPC's legal authority (section III), public use (section IV), and the circuit court's evidentiary rulings (sections VI and VII). IEPC claims that sections III and IV raise issues that have previously been resolved against the landowners by both the ICC and Fourth District. As such, IEPC argues that landowners' appeal of these issues is not brought in good faith, barred by collateral estoppel, and beyond the jurisdiction of this court. IEPC has filed a motion to supplement its motion to strike to address our supreme court's decision in *Ameren Transmission Co. of Illinois v. Hutchings*, 2018 IL 122973. Because we have concluded that landowners' appeal is not brought in bad faith, we decline to strike these sections from their brief. We will address IEPC's additional arguments regarding jurisdiction and collateral estoppel as part of our analysis of the issues raised by landowners on appeal.

¶ 75    IEPC further claims that sections VI and VII should be stricken because landowners violated Illinois Supreme Court Rule 366(b)(2)(iii) (eff. Feb. 1, 1994) by failing to raise these issues in a posttrial motion and Illinois Supreme Court Rule 341(h)(7) (eff. Jan. 1, 2016) by failing to include appropriate citations to the record. Although not cited by IEPC, Illinois Supreme Court Rule 375(a) (eff. Feb. 1, 1994) allows a reviewing court to strike a party's brief, or portion thereof, if that party or an attorney for that party willfully fails to comply with the appeal rules. Where, as here, there was no apparent willful violation of the rules and the alleged deficiencies are not so significant so as to hinder our ability to review the issues, we will not strike landowners' brief but will, instead, disregard any improper, unsupported, or inaccurate contentions. See *Spangenberg v. Verner*, 321 Ill. App. 3d 429, 432 (2001).

¶ 76    Accordingly, we hereby deny IEPC's motion to strike landowners' brief pursuant to Rule 375. We now turn to the issues raised on appeal.

¶ 77                                      B. Issues

¶ 78    Landowners first challenge the circuit court's traverse ruling. Landowners initially argue that the court erred when it treated their traverse motion as a section 2-619 motion to dismiss because it denied them the ability to acquire evidence prior to the traverse hearing and the ability to present evidence at the hearing. Landowners also argue that the court erred when it found that IEPC had legal authority to construct the pipeline because the ICC certificates were invalid and void, the pipeline conformed with the public use requirements of the Act because the pipeline primarily benefits private entities, and IEPC engaged in good-faith negotiations prior to filing the condemnation action. Landowners next challenge the circuit court's evidentiary rulings made prior to and during the jury trial. Specifically, they argue that the court erred when it denied them the ability to present evidence regarding pipeline dangers and the right to cross-examine IEPC's witnesses regarding the terms of the easement at trial. We address these issues in turn.

¶ 79                                  1. Traverse Ruling

¶ 80    Landowners initially challenge the propriety of the procedure followed by the circuit court during the traverse proceedings. Specifically, landowners argue that the court erred when it ruled that it was treating their traverse motion as a section 2-619 motion and refused to take any evidence at the hearing. We agree.

¶ 81    "On appeal, a circuit court's ruling on a traverse and motion to dismiss is generally subject to a manifest weight standard of review, while any questions of law or issues of statutory interpretation resolved by the circuit court are reviewed *de novo*." *Illinois State Toll Highway Authority v. South Barrington Office Center*, 2016 IL App (1st) 150960, ¶ 31. Here, the circuit court's ruling resolved the parties' disagreement regarding the procedure that should be followed during traverse proceedings in cases where a condemning authority has attached ICC orders to its condemnation complaint. The court's resolution of this issue was based on its consideration of section 5-5-5(c) of the Act and caselaw decided prior to the enactment of that statutory provision. Because this presents a question of law, our review is *de novo*.

¶ 82    As noted, our legislature added section 5-5-5(c) when it enacted the current version of the Act in 2007. In doing so, our legislature placed the burden on a condemning authority seeking to exercise eminent domain authority to acquire property for private ownership or control to prove by clear and convincing evidence that the acquisition is "(i) primarily for the benefit, use, or enjoyment of the public and (ii) necessary for a public purpose." 735 ILCS 30/5-5-5(c) (West 2014). Subsection (c) provides, however, that evidence showing the ICC has granted a certificate or made a finding of public convenience and necessity for an acquisition of property for private ownership or control to be used for utility purposes creates a rebuttable presumption that the acquisition meets those two requirements. *Id.*

¶ 83    Caselaw decided prior to the enactment of section 5-5-5(c) has established the procedure for traverse proceedings. Ordinarily, when a landowner files a traverse motion, the burden shifts to a condemning authority to establish a *prima facie* case as to any disputed allegations. *Midland Smelting Co.*, 385 Ill. App. 3d at 965. A traverse motion must be granted when a condemning authority fails to show its right to condemn by proper proof. *Village of Cary v.*

*Trout Valley Ass'n*, 282 Ill. App. 3d 165, 169 (1996). If a condemning authority is successful, the burden shifts to a landowner to prove the condemning authority lacked the requisite authority to effect the condemnation. See *Alsip Park District v. D&M Partnership*, 252 Ill. App. 3d 277, 285 (1993).

¶ 84 Caselaw also shows that a condemning authority may establish a *prima facie* case of the necessity of the proposed taking "by introducing a resolution or ordinance of the governing body which makes a finding that the condemnation is necessary." *Lake County Forest Preserve District v. First National Bank of Waukegan*, 154 Ill. App. 3d 45, 51 (1987). When such resolution or ordinance is introduced, the burden shifts to a landowner to offer evidence that the governing body abused its discretion with respect to its decision concerning the necessity of the taking. *Alsip Park District*, 252 Ill. App. 3d at 284. If a landowner is successful, the presumption in favor of the exercise of the power of eminent domain ceases to exist, along with any benefits of the presumption. See *Reed-Custer Community Unit School District No. 255-U v. City of Wilmington*, 253 Ill. App. 3d 503, 508 (1993). When the presumption vanishes, a circuit court considers evidence submitted by both parties during the evidentiary phase as if the presumption of necessity never existed. *Franciscan Sisters Health Care Corp. v. Dean*, 95 Ill. 2d 452, 460 (1983).

¶ 85 Here, IEPC attached to its condemnation complaint an ICC order authorizing the construction, operation, and maintenance of the SAX pipeline for the transport of crude petroleum along an approved route, as well as an ICC order authorizing IEPC to acquire the property through eminent domain. In response, landowners filed a traverse motion, alleging as follows: (1) IEPC was not properly vested with authority to acquire the property through eminent domain, (2) the property sought through eminent domain was not necessary or convenient for the purpose alleged by IEPC, (3) the amount of property sought was in excess of IEPC's needs, (4) the property sought would not be used for a public purpose, (5) IEPC failed to negotiate in good faith with landowners, (6) the underlying project did not constitute a public convenience or necessity, (7) IEPC did not constitute a common carrier by pipeline, (8) the ICC's grant of eminent domain authority did not apply to the current pipeline project, and (9) IEPC's certificate of good standing expired and was not transferrable to a different project.

¶ 86 While landowners' traverse motion would ordinarily shift the burden to IEPC to establish a *prima facie* case on all disputed issues, IEPC argues that the circuit court properly decided landowners' traverse motion pursuant to section 2-619 because the ICC orders attached to its complaint shifted the burden to landowners under section 5-5-5(c) of the Act. IEPC, relying on the Fourth District's decision in *Koke Mill*, 312 Ill. App. 3d 900, claims that the court properly denied landowners' traverse motion pursuant to section 2-619 because landowners did not support their motion with any evidence to show a lack of good-faith negotiations or to rebut the presumption of public use and necessity created by the ICC orders.

¶ 87 We reject IEPC's claim that this issue is controlled by the Fourth District's decision in *Koke Mill*. In that case, the landowner appealed, among other rulings, the circuit court's denial of their traverse and motion to dismiss, arguing that the condemnor failed to engage in good-faith negotiations before filing its complaint. *Id.* at 907. The Fourth District noted that the landowner did not support its motion with any evidence of the condemnor's lack of good faith, as required by section 2-619(a) of the Code (735 ILCS 5/2-619(a) (West 1998)). *Koke Mill*,

312 Ill. App. 3d at 908. Thus, the Fourth District concluded that the circuit court did not err by denying the landowner's unsupported motion to dismiss. *Id.*

¶ 88 Although *Koke Mill* appears to support IEPC's position, we note that *Koke Mill* was decided prior to the enactment of section 5-5-5(c). While the present appeal was pending before this court, the Fourth District issued its decision in *Kuerth*. In that case, our colleagues in the Fourth District considered the proper procedure and scope of traverse proceedings in a case where a rebuttable presumption has been created under section 5-5-5(c). *Kuerth*, 2016 IL App (4th) 150519. The Fourth District held that a traverse proceeding provides a landowner with the first and only opportunity to challenge the condemnation of his or her property and that a traverse hearing "is akin to a hybrid proceeding in which specific presumptions must be rebutted by landowners challenging the condemnation filing at issue." *Id.* ¶ 169. Following *Kuerth*, the Fourth District rejected the notion that *Koke Mill* supports the broad proposition that all traverse hearings are akin to a section 2-619 motion to dismiss and, instead, reiterated and reaffirmed its holding in *Kuerth*. See *Enbridge Pipeline (Illinois), LLC v. Hoke*, 2017 IL App (4th) 150544, ¶¶ 124-25; *Enbridge Pipeline (Illinois), LLC v. Temple*, 2017 IL App (4th) 150346, ¶¶ 92-93; *Enbridge Pipeline (Illinois), LLC v. Monarch Farms, LLC*, 2017 IL App (4th) 150807, ¶¶ 89-90.

¶ 89 Our narrow scope of review on this issue concerns only whether the circuit court afforded landowners their *only opportunity* to challenge the condemnation of their property. *Hoke*, 2017 IL App (4th) 150544, ¶ 127; *Temple*, 2017 IL App (4th) 150346, ¶ 94; *Monarch Farms*, 2017 IL App (4th) 150807, ¶ 92. We hold that a circuit court must provide a landowner with an opportunity to present evidence on issues raised in a traverse motion at a hearing before ruling on the motion. Here, the circuit court erred when it treated landowners' traverse motion as a section 2-619 motion because it refused to take any evidence at the traverse hearing. In doing so, the court clearly deprived landowners of their only opportunity to challenge the condemnation of their property.

¶ 90 Thus, we vacate the court's denial of landowners' traverse motion and remand for limited proceedings. Before providing specific directions concerning the traverse hearing on remand, we consider the Fourth District's interpretation and application of section 5-5-5(c) in *Kuerth*.

¶ 91 In *Kuerth*, the Fourth District first examined the legislative history of section 5-5-5(c) and noted that "[t]he legislature passed the Act 'in an attempt to limit the use of condemnation power to assist private development.' " 2016 IL App (4th) 150519, ¶ 125 (quoting Richard F. Friedman, *Initial Procedures and Pleadings of the State and Other Condemning Bodies*, in Illinois Eminent Domain Practice § 2.1 (Ill. Inst. for Cont. Legal Educ. 2013)). The Fourth District also noted the legislature added section 5-5-5(c), which creates a rebuttable presumption that the acquisition of property is " '(i) primarily for the benefit, use, or enjoyment of the public and (ii) necessary for a public purpose' " if there is evidence the ICC granted a certificate or made a finding of public convenience and necessity. *Id.* (quoting 735 ILCS 30/5-5-5(c) (West 2014)). The Fourth District next cited *Franciscan Sisters*, 95 Ill. 2d at 460-61, for the general rule that a rebuttable presumption may create a *prima facie* case as to the specific issue in question requiring the party against whom the presumption operates to come forward with evidence to meet the presumption. *Kuerth*, 2016 IL App (4th) 150519, ¶ 131. The Fourth District determined that the ICC's findings were worthy of a strong presumption, requiring the landowners to "present clear and convincing evidence before the applicable rebuttable presumptions burst." *Id.* ¶ 140.

¶ 92    In applying these legal principles, the Fourth District determined that section 5-5-5(c) applied because IEPC attached the ICC orders to its complaint and held that IEPC enjoyed the presumption that its interest in the landowners' properties was primarily for the benefit, use, or enjoyment of the public and necessary for public purpose. *Id.* ¶ 146. The Fourth District also determined that, although section 5-5-5(c) makes no mention of the ICC's good-faith determination, the ICC's grant of eminent domain authority occurs only after it has found a utility engaged good-faith negotiations, thus, the ICC's determination on that issue should similarly be afforded deference by the circuit court. *Id.* ¶¶ 146-47. Thus, the Fourth District concluded that the ICC order granting the condemnor eminent domain authority established a *prima facie* case that the condemnor engaged in good-faith negotiations with the landowners. *Id.* ¶ 147.

¶ 93    The Fourth District noted, however, that the rebuttable presumptions created by the ICC's order "were merely the first steps in this process." *Id.* ¶ 151. The Fourth District explained that, after filing their respective traverse motions, the landowners "were entitled to present relevant evidence" to rebut the presumptions of public use and public necessity and refute the ICC's good-faith determination. *Id.* ¶ 148. Because the circuit court's denial of the landowners' traverse motions "effectively deprived landowners of exercising the option of presenting relevant evidence" to rebut and refute these issues, the Fourth District vacated the circuit court's denial of the landowners' respective traverse motions and remanded the matter back for limited proceedings while retaining jurisdiction of the appeal. *Id.* ¶ 151.

¶ 94    We agree with a majority of the Fourth District's reasoning in *Kuerth*. As previously noted, we agree that landowners are entitled to a new traverse hearing where they have an opportunity to present evidence. We also agree that the traverse hearing should be limited to three issues— good-faith negotiations, public use, and necessity. While we agree that ICC orders may implicate the rebuttable presumption referenced in section 5-5-5(c), the plain language of subsection (c) requires "[e]vidence that the [ICC] has granted a certificate or otherwise made a finding of public convenience and necessity for an acquisition of property" for private ownership or control to be used for utility purposes. 735 ILCS 30/5-5-5(c) (West 2014). In our view, a condemning authority should be required to introduce a certified copy of ICC orders into evidence at the traverse hearing before enjoying the statutory rebuttable presumption that its interests in landowners' property is primarily for the benefit, use, and enjoyment of the public and necessary for a public purpose. We further agree with the Fourth District's determination that the ICC's findings in this regard are worthy of a strong presumption, requiring landowners to "present clear and convincing evidence before the applicable rebuttable presumptions burst." *Kuerth*, 2016 IL App (4th) 150519, ¶ 140; see also *Franciscan Sisters*, 95 Ill. 2d at 460.

¶ 95    Despite this agreement, we respectfully disagree with the Fourth District's conclusion that ICC orders establish a *prima facie* case on the issue of good-faith negotiations. In so concluding, the Fourth District reasoned that, because it was necessary for the ICC to determine that good-faith negotiations had taken place before authorizing a utility to acquire property through eminent domain, the ICC's determination in that regard also warranted substantial deference by the circuit court. We disagree with this rationale for two reasons.

¶ 96    First, as the Fourth District acknowledged in *Kuerth*, deference to the ICC's good-faith determination is not required by section 5-5-5(c) of the Act. *Kuerth*, 2016 IL App (4th) 150519, ¶ 146. Given that our legislature enacted the Act " 'in an attempt to limit the use of

- 22 -

condemnation power to assist private development' " (*id.* ¶ 125 (quoting Friedman, *supra* § 2.1)), we will not read language into the Act that would aid in the use of condemnation power to assist private development.

¶ 97 Second, it is our view that the circuit court, as opposed to the ICC, is better equipped to evaluate a condemning authority's negotiation efforts with each individual landowner prior to filing a condemnation action. The ICC's good-faith determination is based on its consideration of a public utility's collective negotiation efforts with a large number of landowners, without consideration of a utility's negotiation efforts with each individual landowner. We also observe that, here, the order in Docket No. 13-0446 indicates that the ICC's evaluation of IEPC's negotiation efforts was "complicated to some extent by the timing of the filing, which was made more than four years after the underlying Certificate was granted, following a resumption of negotiations." Moreover, the ICC is obviously unable to consider negotiation efforts that occur after a utility receives the ICC's authorization to acquire the property through eminent domain but before a utility has initiated eminent domain proceedings by filing a condemnation action pursuant to the Act.

¶ 98 For these reasons, we hold that an ICC order does not create a *prima facie* case on the issue of good-faith negotiations, pursuant to section 5-5-5(c). Put another way, when a landowner files a traverse motion disputing the issue of good-faith negotiations and a condemning authority introduces a valid ICC order into evidence at the traverse hearing, the burden of establishing a *prima facie* case on the issue of good-faith negotiations remains with a condemning authority. See *151 Interstate Road*, 209 Ill. 2d at 480-81 ("Because good-faith negotiations with the landowner are a condition precedent to condemnation proceedings under the Eminent Domain Act, the question of whether a condemnor has negotiated in good faith bears directly on whether the condemnor was exercising its right of eminent domain improperly."). Thus, where, as here, a landowner raises the issue of good-faith negotiations in a traverse motion, a circuit court should consider the issue of good-faith negotiations prior to considering the issues of public use and necessity.

¶ 99 Before we provide specific instructions in accordance with our interpretation of section 5-5-5(c), we briefly address the issues raised by landowners that challenge the circuit court's substantive findings. Landowners argue that IEPC lacked legal authority to construct the pipeline because the ICC certificates were invalid and void due to subsequent changes in the pipeline project and that there is no valid public use for the pipeline because it primarily benefits private entities. IEPC, relying on our supreme court's decision in *Hutchings*, claims that both the circuit court and this court lack jurisdiction to consider landowners' arguments regarding IEPC's legal authority to construct the pipeline and public use. IEPC also claims that collateral estoppel bars landowners from relitigating these issues, which have been previously resolved by both the ICC and Fourth District.

¶ 100 We first consider the jurisdictional issue raised by IEPC. "Review of final decisions of the [ICC] *** involves the exercise of special statutory jurisdiction and is constrained by the provisions of the *** Utilities Act [citation]." *Illinois Landowners Alliance, NFP v. Illinois Commerce Comm'n*, 2017 IL 121302, ¶ 29. Pursuant to section 10-201 of the Utilities Act, any affected party seeking to have "the reasonableness or lawfulness" of an ICC rule, regulation, order, or decision "inquired into and determined" may file an appeal with "the appellate court of the judicial district in which the subject matter of the hearing is situated, or if the subject matter of the hearing is situated in more than one district, then of any one of such districts."

220 ILCS 5/10-201(a) (West 2016). The first court to acquire "jurisdiction of any appeal from any rule, regulation, order or decision shall have and retain jurisdiction of *** appeals from the same rule, regulation, order or decision until such appeal is disposed of in such appellate court." *Id.*

¶ 101    In *Hutchings*, our supreme court considered whether a circuit court had jurisdiction to review the legality and constitutionality of the administrative proceedings before the ICC. 2018 IL 122973, ¶ 12. Our supreme court first noted that the plain language of section 10-201 of the Utilities Act conferred on the appellate court the power to review final decisions of the ICC and that a court has no power to review the ICC proceedings absent such special statutory jurisdiction. *Id.* ¶ 14. Our supreme court next observed that the circuit court was not exercising the special statutory jurisdiction conferred by section 10-201 of the Utilities Act when it determined that the ICC's proceedings were in violation of due process but was, instead, sitting as a court of general jurisdiction tasked with adjudicating the merits of a condemnation action. *Id.* ¶ 15. As such, our supreme court concluded that the circuit court had no authority to review the ICC's decision or the propriety of the proceedings leading up to that decision. *Id.*

¶ 102    Based on our reading of our supreme court's decision in *Hutchings*, we conclude that both this court and the circuit court lack jurisdiction to consider landowners' argument regarding IEPC's legal authority. Landowners' arguments in this regard are premised entirely on the validity of the certificate and orders issued by the ICC. Because these arguments require review of the ICC's decisions and landowners did not follow the special statutory procedures necessary to confer jurisdiction on this court to review the ICC's decisions, this court has no authority to review the ICC's decisions. Landowners have, instead, appealed the ICC's decisions to the Fourth District. In addition, the circuit court lacks jurisdiction to consider these issues because the plain language of the statute confers jurisdiction only on appellate courts to review the ICC's decisions.

¶ 103    However, we reach a different conclusion with regard to the public-use issue raised by landowners. Although the legislature's grant of eminent domain authority should be afforded great deference, "the exercise of that power is not entirely beyond judicial scrutiny [citation], and it is incumbent upon the judiciary to ensure that the power of eminent domain is used in a manner contemplated by the framers of the constitutions and by the legislature that granted the specific power in question." *Southwestern Illinois Development Authority v. National City Environmental, L.L.C.*, 199 Ill. 2d 225, 236-37 (2002). For this reason, "[c]ourts all agree that the determination of whether a given use is a public use is a judicial function." *People ex rel. Tuohy v. City of Chicago*, 394 Ill. 477, 481 (1946). In line with these basic principles, our legislature has provided in the Act that "a condemning authority may not take or damage property by the exercise of the power of eminent domain unless it is for a public use, as set forth in this Section." 735 ILCS 30/5-5-5(a) (West 2014). Here, landowners' arguments regarding public use do not require review of the ICC's orders or certificates. Instead, the circuit court must consider whether IEPC is taking landowners' property for a public use, as specified under the Act. Thus, we conclude that both the circuit court and this court have jurisdiction to consider the issue of public use.

¶ 104    We also reject IEPC's argument that collateral estoppel bars landowners from relitigating the issue of public use. Specifically, we reject IEPC's claim that collateral estoppel applies because both the ICC and Fourth District have previously resolved this issue against the landowners. "Collateral estoppel is an equitable doctrine that precludes a party from

- 24 -

relitigating an issue decided in a prior proceeding." *Illinois Health Maintenance Organization Guaranty Ass'n v. Department of Insurance*, 372 Ill. App. 3d 24, 34 (2007) (citing *Herzog v. Lexington Township*, 167 Ill. 2d 288, 295 (1995)). "When properly applied, collateral estoppel or issue preclusion promotes fairness and judicial economy by preventing relitigation in one suit of an identical issue already resolved against the party against whom the bar is sought." *Kessinger v. Grefco, Inc.*, 173 Ill. 2d 447, 460 (1996). Before collateral estoppel will apply, the following threshold requirements must be met: "(1) the issue decided in the prior adjudication is identical with the one presented in the suit in question, (2) there was a final determination on the merits in the prior adjudication, and (3) the party against whom estoppel is asserted was a party or in privity with a party to the prior adjudication." *Illinois Health Maintenance Organization Guaranty Ass'n*, 372 Ill. App. 3d at 35 (citing *Herzog*, 167 Ill. 2d at 295).

¶ 105 We find instructive the Fourth District's decision in *Illinois Power Co. v. Lynn*, 50 Ill. App. 3d 77, 78 (1977). In that case, the circuit court denied the landowners' traverse and motion to dismiss an eminent domain complaint filed by a utility pursuant to authority granted by an ICC certificate and enabling order, finding that "the question of public need for this tract had been resolved in the hearing before the [ICC], in which [the landowners] actively participated as parties." *Id.* In so finding, the circuit court accepted the utility's argument that the landowners could not collaterally attack the ICC's order where they did not appeal after participating in a full hearing on the question of public use and necessity held before the ICC under the provisions of the Utilities Act. *Id.* at 79.

¶ 106 On appeal, the Fourth District considered whether the ICC's "finding that the needs and plans of the utility constitute a 'public use,' and that certain properties need be acquired to develop those plans, preempt the courts from inquiring into these same subject matters, where the property owners fully participated as a 'party' before the [ICC]." *Id.* at 78. In answering that question in the negative, the Fourth District reasoned as follows:

> "In essence then, the property owners *** were not 'parties to the proceedings' in the sense of parties to a litigation. The hearing was on the reasonableness of the utility's *plans* and could not confer property rights. Appeal of the order of the [ICC] to the courts as provided by statute would only have been a review of the proposed plan for development of the project and the extent of the property to be sought. The appearance of the owners before the [ICC] to give input into the plans, or object thereto, could not bar them from later exercising their rights as owners of property being taken for a public use. There is nothing in the [Utilities Act] preempting the rights of property owners in the condemnation proceedings. The two acts must be read in harmony if possible." (Emphasis in original.) *Id.* at 81-82.

See also *Adams County Property Owners & Tenant Farmers v. Illinois Commerce Comm'n*, 2015 IL App (4th) 130907, ¶¶ 47-51 (citing *Lynn* approvingly). Accordingly, the Fourth District reversed the circuit court's order denying the landowners' traverse motion and remanded for further proceedings. *Lynn*, 50 Ill. App. 3d at 82.

¶ 107 Similarly, here, landowners did not participate in the ICC proceedings as "parties" to a litigation because the ICC hearings addressed the reasonableness of IEPC's plans and did not confer property rights. Thus, we reject IEPC's claim that collateral estoppel bars landowners from raising the issue of public use, and we now turn to the specific instructions on remand.

a. Directions on Remand

Upon the filing of this opinion remanding this matter for limited proceedings, the circuit court is vested with the authority to conduct an expedited hearing on landowners' traverse motion in accordance with this opinion and the directions we provide. Although we decline to impose a specific time frame in which the court must conduct the expedited hearing, we expect that the court will conduct the hearing at the earliest possible opportunity. Because landowners waived review of their claims regarding discovery, the court should decide the traverse motion based on the evidence that has previously been acquired without further discovery. At the traverse hearing, the circuit court is limited to considering three issues—good-faith negotiations, public use, and necessity. We direct the circuit court to disregard issues requiring review of the ICC's orders or decisions, including issues raised by landowners' traverse motion relating to IEPC's legal authority, excess taking, and the validity or expiration of IEPC's certificates.

At the traverse hearing, the circuit court is to first address the issue of good-faith negotiations. In doing so, the court should initially determine whether IEPC presented sufficient evidence to support a finding that proved by a preponderance of the evidence that it negotiated with landowners in good faith. If the court determines that IEPC fails to meet its burden on this issue, the court should enter an order dismissing IEPC's condemnation action. If, however, the court determines that IEPC meets its burden on this issue, then the burden will shift to landowners to refute IEPC's evidence of good-faith negotiations. Accordingly, both IEPC and landowners should be permitted to present evidence relevant to this specific issue. The court should consider the evidence presented and make detailed findings in support of its determination on this issue.

If the circuit court ultimately determines that IEPC has not engaged in good-faith negotiations with landowners, it should enter an order dismissing IEPC's condemnation action. If the court ultimately determines that IEPC has engaged in good-faith negotiations with landowners, it should then address the issues of public use and necessity. In doing so, the court should consider the ICC orders introduced by IEPC at the hearing and determine whether such orders implicate the rebuttable presumption in section 5-5-5(c) of the Act. If the court finds that the statutory presumption applies, the burden will shift to landowners to present clear and convincing evidence to rebut the strong presumption that IEPC's interest in landowners' property is (1) primarily for the benefit, use, or enjoyment of the public and (2) necessary for a public purpose. If landowners do not meet their burden, the court should enter an order denying landowners' traverse motion. If landowners meet their burden, however, the presumption vanishes, and the court should consider the evidence submitted by both parties as if the presumption never existed. See *Franciscan Sisters*, 95 Ill. 2d at 460. After considering the evidence, the court should make detailed findings in support of its determinations on these issues. In accordance with its determinations, the court should either enter an order either denying landowners' traverse motion or dismissing IEPC's condemnation action. Under either circumstance, the court should certify the record to this court so this appeal can be fully resolved.

b. Procedural Posture of Remand

Because this court has concluded that the circuit court failed to conduct a proper traverse hearing, we vacate the circuit court's traverse order and remand this cause for the limited

purpose of conducting a traverse hearing in accordance with this court's directions. See *Hoke*, 2017 IL App (4th) 150544, ¶ 146. This court retains limited jurisdiction to review the previously raised issues in addition to the circuit court's ruling following remand. See *People v. Garrett*, 139 Ill. 2d 189, 195 (1990). Any party who is aggrieved by the circuit court's rulings on remand will have 21 days to submit a supplemental brief to this court. If a supplemental brief is filed by an aggrieved party, the opposing party shall have 21 days to file a response. This court will not grant any requests for extension of time to file supplemental briefs. The parties shall only address issues relating to the circuit court's rulings on remand. Arguments on issues not directly related to the traverse hearing may not be raised without this court's permission.

¶ 114                                    2. Evidentiary Rulings

¶ 115       Landowners also challenge the circuit court's evidentiary rulings made prior to and during the jury trial. Specifically, they argue that the court erred when it denied them the ability to present evidence regarding pipeline dangers and the right to cross-examine IEPC's witnesses regarding the terms of the easement. Because Illinois Supreme Court Rule 366(a)(5) (eff. Feb. 1, 1994) empowers this court to "make any other and further orders *** that the case may require" in civil appeals, we will consider the merits of these issues after the circuit court conducts a proper traverse hearing and we issue our final determination in this case. Thus, after traverse proceedings on remand have been completed and any supplementary appellate issues have been briefed and argued, this court will announce its judgment on all pending issues. See *Garrett*, 139 Ill. 2d at 195.

¶ 116                                     III. Conclusion

¶ 117       For the foregoing reasons, we vacate the circuit court's traverse judgment and remand for further proceedings consistent with the directions set forth in this opinion.

¶ 118       Vacated; cause remanded with directions.